**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

UNITED STATES OF AMERICA,

    Plaintiff,

vs.

ANDREW SCOTT LIVINGSTON,
TERESA LYNN SCHNABEL,

    Defendants.

No. CR 13-1978-TUC-CKJ (LAB)

**ORDER**

On April 18, 2014, Magistrate Judge Leslie A. Bowman issued a Report and Recommendation (Doc. 60) in which she recommended that the Motion to Suppress (Doc. 33) filed by Andrew Scott Livingston ("Livingston") and Teresa Lynn Schnabel ("Schnabel") be denied. The Report and Recommendation ("R & R") notified the parties that they had fourteen days from the date of being served with the copy of the R & R to serve and file any objections. Livingston and Schnabel have each filed objections to the R & R. (Docs. and 64).[1] The government has filed a response. (Doc. 72).

I. *Standard of Review*

The Court has reviewed the Motion to Suppress (Doc. 33), the response (Doc. 39), the Report and Recommendation (Doc. 60), the transcript of the hearing held before the magistrate judge (Doc. 63), the objections (Doc. 62 and 64), and the response (Doc. 72). The standard of review that is applied to a magistrate judge's report and recommendation is

---

[1] Schnabel also joins in Livingston's objections.

1  dependent upon whether a party files objections – the Court need not review portions of a
2  report to which a party does not object. *Thomas v. Arn*, 474 U.S. 140, 150, 106 S. Ct. 466,
3  472-73, 88 L.Ed.2d 435 (1985).  However, the Court must "determine de novo any part of
4  the magistrate judge's disposition that has been properly objected to.  The district judge may
5  accept, reject, or modify the recommended disposition; receive further evidence; or return
6  the matter to the magistrate judge with instruction." Fed. R. Civ. P. 72(b)(3); *see also* 288
7  U.S.C. § 636(b)(1) ("A judge of the court shall make a de novo determination of those
8  portions of the report or specified proposed findings or recommendations to which objection
9  is made.").

10

11 II. *Objections to Fact Statement of Magistrate Judge*

12  Defendants object to the magistrate judge's statement that Hector Sanchez ("Sanchez")
13 is a "known scout for drug and alien smugglers." (R & R at p. 3, line 1.)  Livingston asserts
14 Agent Cordice testified that Sanchez had never been detained, arrested or charged with any
15 offense relating to his alleged activities and that there were no law enforcement reports
16 written that had documented Sanchez as involved in scouting for aliens or drug load drivers.
17 Rather, Defendants argue Cordice's belief was based solely on informal talk among Border
18 Patrol agents.  The relevant testimony is as follows:

19   Q [Mr. Fink].  Okay. Now, let's talk about Hector Sanchez.  You said that Hector
20   Sanchez is either known or believed to be involved in drug trafficking, a scout. Is that
     correct?

21   A [Agent Cordice].  Yes, sir.

22   Q. And what do you base that on specifically? Are there any intelligence reports or
     anything like that that you base that on?
23
24   A. None that I can put my hand on.  It's just agent word of mouth, pointing it out on
     the field training unit and everything. We have encountered him before. I've actually
     pulled him over before.
25
26   Q. That's why I'm trying to be specific. At that time on that day when you observed
     Hector Sanchez, could you recall, are there any reports that you ever reviewed that
     concerned Hector Sanchez and drug trafficking?
27
     A. No.
28

- 2 -

1  Q. Has Hector Sanchez ever been to your knowledge prosecuted for drug trafficking?

2  A. To my knowledge, no.

3  Q. Has he ever been -- has he ever been arrested for drug trafficking?

4  A. To my knowledge, no.

5  Q. And so never been arrested, never been charged, there's no reports about him. Has he ever been -- has he ever been stopped and found to be in possession of drugs?

6  A. No, sir.

7  Q. Has anyone ever been arrested to your knowledge with drugs who specifically identified him as a scout?
8  A. To my knowledge, no.

9  Q. Have there been any informants -- I'm not asking anyone's name. Have there ever been any informants that have identified him as a scout for drug trafficking?

11  A. To my knowledge, no.

12  Q. And so this is just solely based upon -- correct me if I am wrong -- solely based on informal discussions among agents who believe that is what he is doing?

13  A. Correct.

Transcript ("TR"), pp. 44-45. Agent Cordice's testimony was that Sanchez was either known or believed to be a scout. He testified that his knowledge or belief was based on agent word of mouth and it having been pointed out on the field training unit. Because the magistrate judge's factual summary accurately summarizes Agent Cordice's testimony, the Court overrules this argument. However, the Court will address the basis of Agent Cordice's knowledge or belief *infra*.

Defendants also object to the magistrate judge's statement that Agent Cordice "knew almost right away that he would refer the car to secondary." (R & R at p. 3, line 1.) Defendants assert the agent made the decision to refer the vehicle to secondary as soon as it arrived at the checkpoint. In other words, he made the decision to detain defendants immediately upon their arrival there. Agent Cordice testified that he made the decision to send the vehicle to secondary as soon as he could see the nervous actions of the driver. In other words, at a time when no canine unit was available and when agents become more vigilant because scouts look for the absence of a canine, Agent Cordice observed an

- 3 -

unknown vehicle with a nervous driver. The Court agrees with the magistrate judge's statement that Agent Cordice knew *almost* right away, rather than right away, that he would send the vehicle to secondary. The Court overrules this objection.

III. *Objections to the Report and Recommendation of Magistrate*

Defendants assert the magistrate judge erred in concluding that the government had met its burden to show Defendants were engaged in other criminal activity, prior to referring them to secondary.

A. *Sanchez as a Scout*

Defendants argue there was no real evidence that Sanchez was a scout. Cordice testified Sanchez had never been charged with any offense relating to his alleged activities, he had never been arrested for such activities, he had never been detained for such activities, and that there were no law enforcement reports written that had documented Sanchez as involved in scouting for aliens or drug load drivers. The government argues the agent reasonably relied on this training and his fellow agents' knowledge.

The information was provided to Agent Cordice through not only word of mouth from other agents, but also on the field training unit. The substantive basis for the information need not be relayed to an agent. *United States v. Ramirez*, 473 F.3d 1026 (9th Cir. 2007). Even if the information is shown later to be erroneous, an agent may rely on such information. *See* 6A C.J.S. Arrest § 31, *citing United States v. Lape*, 413 F.2d 816 (9th Cir. 1969), *Turner v. State*, 74 So.2d 891 (Fla. 1954), *State v. Somfleth*, 8 Or.App. 171, 492 P.2d 808 (1972). The Court finds Agent Cordice reasonably relied on the information provided to him that Sanchez was known or believed to be a scout.

B. *Questioning Prior to Referral to Secondary*

Defendants assert the magistrate judge's conclusion was based, in part, on questioning that went beyond what was permitted. An immigration checkpoint stop is constitutional only

1  if it is "limited to a few brief questions about immigration, the production of immigration
2  documents, and a 'visual inspection of the vehicle...limited to what can be seen without a
3  search.'" *United States v. Preciado-Robles*, 964 F.2d 882, 884 (9th Cir. 1992) (quoting
4  *United States v. Martinez-Fuerte*, 428 U.S. 543, 558 (1976)).

5  Defendants argue Agent Cordice's questions of where Livingston was coming from,
6  why he was in Sonoita, and whether the agent could look in the vehicle's trunk "in the
7  absence of any evidence of illegal immigration activity," Livingston's Motion, p. 4, and were
8  not related to immigration, Schnabel's Motion, p. 2, were impermissible. Defendants assert,
9  therefore, the magistrate judge erred in relying on that information in determining the
10 government had sustained its burden in establishing defendants were engaged in other
11 criminal activity prior to referring them to secondary. *See United States v. Taylor*, 934 F.2d
12 218, 221 (9th Cir. 1991); *see also United States v. Wilson*, 7 F.3d 828, 834 (9th Cir. 1993).

13 The government argues the questions asked at the checkpoint were brief and were
14 relevant to the purpose of an immigration checkpoint, which is to discovery immigration
15 crimes. Although Agent Cordice may not have believed Defendants were illegal aliens,
16 American citizens can commit immigration crimes (e.g., alien smuggling). *See e.g. Wilson*,
17 7 F.3d at 834 (investigation continued after production of valid immigration documents).
18 Further, the government argues the brief questions did not constitute any greater intrusion
19 on Defendants' privacy than if Agent Cordice had asked them about their own immigration
20 status.

21 During the evidentiary hearing, Agent Cordice testified as follows:

22 Q [Ms. Dronzek]. And so you said you wanted to ask him why they were going through the checkpoint?

23 A [Agent Cordice]. Yes.

24 Q. So what conversation happened next?

25 A. Oh, I asked them where they were coming from and they said Sonoita. The driver said Sonoita. And I found that was odd.

27 Q. Why did you think that was odd?

28

- 5 -

1    A. There's nothing really to do down there on the weekday unless you live there or you have family there or you are staying there.

2

3    Q. And you said he was unfamiliar to you as a local?

4    A. Correct.

   Q. And what was his response, the driver's response, to why they were in Sonoita?

5

6    A. He had no response. He pretty much froze.

   Q. He gave no answer at all?

7

8    A. No.

   * * * * *

9

10    Q. Did you ask him about the ownership of the car?

   A. Yes.

11

12    Q. What did he say?

   A. He said it was a rental.

13

14    Q. Did he provide you the rental agreement?

15    A. No. I asked him for it and then he started fumbling to find it and he asked the passenger if she could find it.

16    Q. And what happened next in the conversation?

17    A. I asked him if I could look in his trunk.

18    Q. And what was his response?

19    A. His -- I asked, "Do I have permission to look in your trunk?" What did I ask him? Sorry. It was clearly worded in my report. I don't have it with me.

20

21    Q. Would it refresh your recollection to be able to take a look at your report?

   A. Yes, ma'am.

22

23    A. I actually remember now. I asked him, "Do you mind if I look in your trunk?" And he said, "Yes." And I thought it was a weird response. I tried to clarify and I'm like, "Can I look in your trunk?" And he said, "No."

24

25    Q. And what happened next after he said, "No"?

   A. I referred him to secondary. I told him to pull over to secondary.

26

TR, pp. 33-35.

27

28

- 6 -

The questions by the agent were brief and were relevant to the purpose of an immigration checkpoint. Even though Agent Cordice did not suspect the occupants of the vehicle were illegal aliens, the questions asked could be relevant to an investigation of other immigration crimes (e.g., transportation of alien in the trunk). The Court finds consideration of the conversation to be appropriate in determining whether the vehicle should have been referred to secondary.

C. *Articulable Suspicion for Referral to Secondary*

Agent Cordice was at the checkpoint during the drug detection dog's absence. He knew that a suspected scout, whose demeanor was not usual, had recently passed through the checkpoint. The agent was afforded an opportunity to visually inspect the vehicle. The vehicle was unfamiliar to the agent, unusual given his experience with the traffic patterns through the checkpoint at that time of day, and possibly a rental. The agent also observed the driver's nervous appearance. The Court considers these circumstances, and the answers provided (and not provided) by Livingston.

As the Ninth Circuit has stated:

> Often, the data in the record seems equally capable of supporting an innocent explanation as a reasonable suspicion. In such cases, the Supreme Court directs us to give due weight to the factual inferences drawn by law enforcement officers, *United States v. Arvizu*, 534 U.S. 266, 277, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002), and has noted that officers may make reasonable deductions and inferences based on their experience and specialized training that "might well elude an untrained person." *Id.* at 273, 122 S.Ct. 744 (internal quotation marks omitted). In this vein, the Court has emphasized that even when factors considered in isolation from each other are susceptible to an innocent explanation, they may collectively amount to a reasonable suspicion. *Id.* at 274, 122 S.Ct. 744.

*United States v. Berber-Tinoco*, 510 F.3d 1083, 1087 (9th Cir. 2007); *see also United States v. Valdes-Vega*, 738 F.3d 1074, 1078 (9th Cir. 2013) (consideration of totality of circumstances "precludes a 'divide-and-conquer analysis' because even though each of the suspect's 'acts was perhaps innocent in itself . . . taken together, they may warrant further investigation.'"). The agent was entitled to make reasonable deductions and inferences, based on his years of experience and his specialized training. This case does not present a

- 7 -

situation where the inferences drawn by the agent were not supported by evidence. *Nicacio v. INS*, 797 F.2d 700, 705 (9th Cir. 1986); *United States v. Jimenez-Medina*, 173 F.3d 752, 754 (9th Cir. 1999). Rather, the Court finds the government has met its burden of proof to show that, at the time Agent Cordice referred the vehicle to secondary, "the brief further detention . . . [was] predicated on an articulable suspicion or 'a minimal showing of suspicion,' . . . of criminal activity." *Taylor*, 934 F.2d at 221 (citation omitted).

IV. *Finding that Referral to Secondary was Not for Immigration Purposes*

The magistrate judge found "defendants met their burden to show that Agent Cordice's referral to secondary inspection was not for immigration purposes." R & R, p. 5. Although the government argued investigation of immigration crimes is not only to determine the citizenship of the persons in a vehicle, the government has not objected to this finding by the magistrate judge. As previously stated, the Court need not review portions of a report to which a party does not object. *Arn*, 474 U.S. at 150. As consideration of this issue is not needed to determine whether Agent Cordice had an articulable suspicion that defendants were engaged in criminal activity prior to referring them to secondary, the Court declines to review this portion of the report.

Accordingly, after an independent review, IT IS ORDERED:

1. The Report and Recommendation (Doc. 60) is ADOPTED.
2. The Motion to Suppress (Doc. 33) is DENIED.

DATED this 16th day of May, 2014.

_____
Cindy K. Jorgenson
United States District Judge